The court appreciates your willingness to accept the CJA appointment. Thank you, Judge. If the court please, your honors, my name is Kenneth Hensley. I represent Jackie Shelledy. This is a case that was tried in late October, early November of 2018. I was trial counsel. My client's sister is here today, and the jury found my client guilty of conspiracy to distribute controlled substance, and after his previous record was assessed and the quantities that were alleged by the government were assessed, he received a 300-month sentence. For the reasons that are stated in the brief, and I realize this court gets a great number of conspiracy to distribute cases, I understand that. I think that there's some critical things that happened in this case that means that Mr. Shelledy did not get a fair trial, and specifically, there were a number of people who entered into cooperation agreements with the government, including Teresa Wolf, and any fair reading, I think, of the facts of this case, the testimony that was given, would lead one to conclude that Teresa Wolf was in a drug distribution conspiracy with Clarence Bradley. The record is replete. Other people who were unindicted co-conspirators, such as Randall Holmes, Robert Summers, Melanie Pierce, do not figure into the Wolf and Bradley relationship. But the cases that we cite, I think, show that the evidence in this case was that Mr. Shelledy would, from time to time, use drugs, and he knew some of the people who were involved in distributing the drugs. But, I respectfully submit, Mr. Shelledy appears one time in the surveillance that the task force set up. They had Teresa Wolf's residence under surveillance, and over many, many months, Shelledy appears one time, even though he knew Teresa Wolf. One of the things that got this investigation started was that Teresa Wolf participated in 13 separate controlled drug purchases to undercover informants, including Detective Reddy's of the ATF. And it was that that spawned the investigation. And the record is clear that at no time was Jackie Shelledy caught with controlled substances. At no time was he arrested with cash or paraphernalia on his person. He was not seen at any of these transfers that Teresa Wolf made with Clarence Bradley. And so we think that the provisions that this court outlined in Boykin, in order to have a conspiracy, there must be a conspiracy to distribute a controlled substance that the defendant knew of the conspiracy, the defendant intentionally became a part of the conspiracy. And we also cite Cox, unless there's some showing that the individuals joined together to further an agreed upon criminal purpose, rather than just a buyer-seller. This court's well aware that in Boykin and other cases, being a buyer is not sufficient. To compound Mr. Shelledy's dilemma at trial, the government offered, we would maintain without any provocation, evidence of Mr. Shelledy's association with a group known as the Galloping Goose. And this court has passed on that issue in Street, and in U.S. v. Street, and in other cases that are cited. I'm not here to suggest that there might not be a time and a place in a trial, in particular for controlled substances distribution, where a person's affiliation with a motorcycle gang or a gang or other outlaw organization, that might well be relevant. This is not that case. If you look at the three, by the way, we filed a motion in limine, and we objected vigorously at every stage. This is well preserved. We did not invite this error. We did not open the door. And the government, I'm really somewhat baffled by why they would muddy this record, a week-long trial with this evidence. What evidence did they present? When Teresa Wolf was interviewed by the task force and confronted about the 13 controlled buys, now these are significant. They started off buying grams from her, ended up buying many, many ounces at a time, perhaps a pound at a time. She was a significant drug distributor, and she was getting her quantity from Clarence Bradley. So there is a Bradley-Wolf conspiracy. Shellady's not part of it. She mentions to Detective Reddy's that Mr. Shellady is a member of the Galloping Goose. Now this is in her controlled substance interview after they've arrested her. Randall Holmes mentioned in his testimony, he's someone who made a deal and went and testified at trial, that he was in a different motorcycle gang and that he had met the defendant at what they call a run, a weekend run where they go to certain destinations and have picnics and drinks and the like. Completely irrelevant to any of their, my client's identity was not an issue, motive was not an issue. We denied the motive, but it was not an issue that needed to be proven. There was a telephone call that was recorded between my client and his wife, Lisa, where there was some discussion of his affiliation in that phone call. These are three instances in which the government, sua sponte, without provocation and without to my mind any clear purpose other than to throw mud on Mr. Shellady, I'm, for the life of me, if someone can read this transcript or be in the trial as I was and find a connection to an issue that needed to be proven in this case, how this galloping goose information would have aided that or tended to make that issue more likely than not the hallmark of relevancy, I don't know what issue it could have possibly proven. There was no threat of violence. In the Payne Owens case, I think this court decided you could use it to interpret slang or hand gestures. There was none of that. It's completely baffling. It was highly damaging for this to come into play. The phone call- The government argues that it provided context to a threat to another witness who was, quote, still a member. Do you remember that argument? The threat is what we reference in point, I believe it's point three, where we talk about the instruction 34 that was given. It was alleged by the government that recorded phone calls that the defendant made to his wife among others from his incarceration in Leavenworth. In that phone call, he threatened, he apparently asked Lisa to get word to a person that he was still a member of the galloping goose and that she needed to be reminded. This person was a person named Angel who was not a witness. She was not a government witness and the explanation given, and we, I think, gave this in our motion in Lemony, was that, first of all, this person that is allegedly being threatened is not a witness, which I think is required to give instruction 34, which is point three, I think, of our argument. The allegation was, or the issue was, that the defendant believed that this person, Angela, was indicating to other people that Shelledy had joined the government team and was going to testify against others. That not only was against what he wanted to do, but it also endangered him. In the facility that he was being held, it's called Core Civic, and it's, I'm sure the court's aware, it's in Leavenworth. There was no indication in this phone call, and it's part of the appendix, I believe it's exhibit 31 that's part of the appendix, or 32. There's no indication that Lisa's to do anything other than remind Angel that the defendant is still an active member in this gang. Now, one, I'm sure, would try to extrapolate from that, that that's a veiled threat, and that may well be an interpretation. My client says the reason he did that was it endangered his safety where he was being held in confinement. But any way you look at it, Angel's not a witness. If that can be the basis of a different charge, such as obstructing or something like that, perhaps if the government believes they could prove it, which I seriously doubt, but it's not a threat to a witness in the case that's being tried. We tried in vain to get the trial judge to understand that to give instruction 34 was error, because it says that he threatened a witness. He did not threaten a witness. Angel was never listed. So imagine now what's occurred. We have evidence that my client is connected in some way to all of these people, Teresa Wolfe, Clarence Bradley, and some of these connections are pretty tenuous. In order to make their case, the government then introduces the galloping goose on these three occasions, which we objected to. And then they compound the problem by giving instruction 34, which instructs the jury that they may consider this threat as consciousness of guilt against a person who's not a witness. And that leads me into our final points. The government was permitted over our objection to introduce evidence under Rule 404B, a 1998 drug conviction, remote in time, a possession charge involved no violence, no gang affiliation, a rudimentary possession charge for which my client served his supervised release. My client served 14 years before, or spent 14 years before this trial as a law-abiding citizen of Sedalia, Missouri, and of Springfield, Missouri. He was the maintenance director at Tyson Food in Springfield, Missouri. I think some context to his life is in order, because the government would have you believe, well, this evidence of this conviction somehow shows knowledge or refutes his claim of lack of identity or motive. It proves nothing. He's a different person by the time. This bootstrapped us into almost being forced to put Mr. Shelledy on the stand, as a result of which two other drug convictions from the 1980s and the early 90s came into evidence. I propose to cross-examine government witnesses by adding some of the details of their admitted crimes. Under Rule 609, this was rejected. I was not allowed to cross-examine on any conviction more than 10 years old, even though they introduced my client's conviction that was 17 or 18 years old. Randall Holmes had participated in a kidnapping. The victim was tortured, burnt, beaten, deprived of water and food. The police arrived at the nick of time to save the victim. Randall Holmes was permitted to testify, and all I could do is ask him whether he'd ever been charged with the crime of kidnapping. Now, this case involved the credibility of the government informants versus the credibility of my client and his witnesses that he called. Don't you think a little bit of context? You can continue. Yes, I'll save the rest of my time. Thank you. Very well. May it please the Court, my name is Phil Copping with the U.S. Attorney's Office, the Appellate Division, and I'm here to argue on behalf of the government. With respect to the first argument, as I understand Mr. Hensley's argument, he's saying that while the government's evidence was replete, as it certainly was, with Mr. Shellady both buying and purchasing distribution amounts of methamphetamine, that really all it boiled down to was individual buyer-seller agreements. We've set out the evidence at length under point one. I mean, if you just look at Teresa Wolfe's testimony, our first witness, we were required to prove that he conspired to distribute more than 50 grams. The investigation, of course, focused on Teresa Wolfe. Her original supplier was Bradley. There was testimony that there was a falling out at some point, and then Shellady became her supplier. Her testimony was that, among other things, she received a quarter pound amounts, approximately 113 grams, from Shellady on several occasions. She told the undercover officer that she'd be selling the drugs to, that Shellady was her supplier. The methamphetamine that was emitted was 112.4 grams. Our point is, is just on her testimony alone, never mind Bradley, never mind all of the other witnesses, we had plenty of evidence to support our case. The argument is, is that these are just seller, you know, buyer-seller agreements. In this jurisdiction, in any event, there is such a thing as you can technically violate the statute if I have a friend and I give drugs to you, maybe technically I'm agreeing to sell you drugs. But under the law, that's not what Congress had in mind here. And so those, even technically they might meet the definition, they don't count. But that's not what we have here. We have three years and one month of numerous transactions. We have situations where he's fronting the drugs, waiting for the money. We have situations where he's obtaining drugs, selling them, splitting the proceeds. So if this isn't a conspiracy, I don't know what is. So I just don't think that's a realistic argument to make here in this case. With respect to the second case, and the issue is somewhat near and dear to me because I do the short straw on the Street case. I was tasked with arguing that case. And for those of you who may remember, there was 40-some, 45, 46 pages of nothing but outlaw motorcycle gang evidence. Street was not a member of a motorcycle gang. He was associated with someone who'd been in a gang. But he'd gotten kicked out for being too violent. It's like being kicked out of the Klan for being too racist. And yet we put all the evidence in, even though it really had no relationship. And the only thing I could argue in front of this court was, well, it was irrelevant. It's like watching a History Channel movie, but it had nothing to do with the case. This is not this case. In this case, even though Mr. Hensley talked about, I think he used the word outlaw. I know he used the word gang. We didn't use the word outlaw. We didn't use the word gang. As far as anybody knew, other than the one instance where the witness equated it to Hell's Angels. It was simply a motorcycle club, and it explained the relationships between these. And it also gave context, and this is the key part here, which Mr. Hensley tries to downplay. But in a recorded telephone call, Shelley tries to silence a potential witness. Now he's saying she didn't testify. Well, nobody had testified at that point. And if you are allowed to intimidate witnesses and avoid an instruction by being successful and saying, hey, that witness never testified, therefore you don't get the instruction. But that's the next point. But in any event, this is a situation where you've got to give some context to why is this a threat. Basically, you have Shelley telling his wife to tell this person to quit saying he's a snitch because he's still a member of this club. Now, we didn't go into any details about bad acts the club might have committed. We didn't call it an outlaw motorcycle gang. We didn't call it a gang at all. There was also a testimony regarding how he became associated with Randall Holmes. But again, no evidence that there were any unsavory characters that he's associating with. I mean, quite honestly, most of our witnesses were unsavory characters. They admitted to a lot of bad acts, including acts with Mr. Shelley. But as far as any testimony was concerned involving, like what the, that this was a gang he was in and that they were dealing drugs, there was no evidence that motorcycle gangs were tied to any of this activity. It was just a aspect of the case, as I said, that allowed us to show how these associations occurred. And to the extent that there was a pejorative aspect of it, it was supplied by our evidence showing, A, he's attempting to use this as sort of a threat. And then when Teresa Wolfe is talking about whether she should be trusting this undercover officer, or he asked her, do you trust us? She says to him, well, if I didn't trust you, you'd be dead because I have friends in the Gooses. And then that's when she said Hell's Angels, which is the only real association in terms of outlaw motorcycle gangs. But that gets us to the third point. And the third point is instruction 409, it was model instruction 409, it was instruction 34. We did a moot court on this, and someone said, you say it mirrors 409. I guess there was one word that was off. There was one word added or omitted. But other than that, it is 409. And it basically says, attempts by a defendant to influence a witness may be considered as showing consciousness of guilt. That's all it said. And we had really two different aspects of the trial which supported this. I've alluded to the one where, but basically you had again the call where he's telling her that, well, he didn't say but. But he told his wife that she should be prepared to kick his behind for supposedly labeling him as a snitch, basically telling him that he's still affiliated with the Gooses, or so they should be wary. There was also another instance involving Robert Preston Summers, who said that Shellady had approached him, Summers, and wanted him to say that Clarence Bradley had been lying. So that was still a second effort. That's not mentioned in Mr. Hensley's brief. That's a second instance that supported that instruction. And those are both set out in our brief. With respect to issue four, which had to do with Shellady's 1998 federal convictions, I did point out, Mr. Hensley pointed out, that he brought up on his own several older convictions that we were not prepared to get into, but he brought them out anyway. So I don't know why he would argue that his 98 conviction is bad. But basically his argument mirrors what the defendant argued in the Ellis case. And it's one of the reasons I cited at great length. Ellis responds to virtually every argument he makes in this case in terms of what Ellis says is when you have a general denial and your conviction is for the same offense, identical offense, then it's, the court is authorized to admit that, especially when it's here, it gives an instruction limiting the uses to which that conviction can be put. One was possession. The prior was a possession, right? It's not exactly the same offense. In 1998, it's pretty remote. I thought it was a possession with intent to distribute. But there are case laws that talk about that, though, too, that talk about even if a situation, and that's the Gibson case that says, even if it shows prior possession of drugs, even in amount consistently with personal use, it's still admissible to show knowledge and intent. It's not admitted to show propensity. But as I said, he introduced on his own several other convictions that we weren't prepared to go into, so I don't know how he can distinguish between them. With respect to the final issue, we have, the first question was whether or not he could get into a conviction involving Teresa Wolfe that was outside the 10-year period, basically allowed by 609. 609 creates a presumption of inadmissibility, but there is no basis that he's raised that would suggest that this presumption should be rebutted. I mean, Teresa Wolfe got in there and testified not only to prior state convictions, but her involvement in this conspiracy, it's not like she wasn't or couldn't have been thoroughly impeached here. And then the other argument is that he was prejudiced by the fact that he couldn't get into the details of some of our witnesses' prior convictions or charges. So he said he wants to get into the factual details of Manny Smith's escape from custody, details of Clarence Bradley's failure to comply with a plea agreement, and factual details of Holmes' kidnapping charge. And so the first question is, even if you're dealing with prior convictions, what can you get into? And on prior convictions, the case law basically says you can get into the name of the conviction, the date, and in some instances, the type of conviction, and in some instances, and the cases aren't consistent on this, the punishment imposed. It is true that under 608B, if you have specific acts of misconduct that show traits of dishonesty or honesty, you can get into that. But he's not alleging that any of these details that he's talking about, the kidnapping of Holmes or anything, that has anything to do with honesty or dishonesty. And as I pointed out in my brief in great detail, they knew they weren't dealing with altar boys here. Every one of our witnesses, insofar as they were part of this conspiracy, testified as to their involvement and to their prior convictions. And so it's not like the jury didn't have a really complete picture of what sort of witnesses we're dealing with. Getting into the natures and sorted details of this kidnapping that Holmes did, for example, that doesn't show truthfulness, doesn't show honesty. Basically, what it would do is put the focus on him and away from Shelley. And if he could get away with it, great, but the trial judge, in her discretion, said no, you can't be doing that. I have two minutes left, but it's getting late in the day. And unless the court has any questions, that concludes my argument. I would urge the court to affirm the conviction. Thank you. Hearing none, thank you, Mr. Coffey. I don't have much time. I'll be very brief. I would say about the galloping goose, I would reiterate once again, this was brought in over our objection, over a motion in limine. He suggests, Mr. Coffey suggests that somehow they didn't countersink it with a hammer or hit it with a sledgehammer, so therefore, just with a regular hammer, that's not too much. Once the jury hears the galloping goose motorcycle club, once they hear Teresa Wolf say to the ATF agent, you're lucky you're still here because I have friends in the galloping goose. It has a disastrous effect, it's inflammatory, it's prejudicial. And here, there wasn't anything possible that it could have been designed to prove or disprove. What did it prove? Randall Holmes knew the defendant. You could say you knew him from a few years ago. You don't have to add, you knew him from motorcycle gang. So, your honor, I understand, your honors, that you have a lot of cases like this. This very serious matter, 300 month sentence. My client has not a hint of violence in his record of any kind. We ask you respectfully, reverse the trial court judgment, give him a new trial. Thank you. Thank you, Mr. Hanson. Appreciate your appearance today. Case will be submitted and decided in due course. Ms. McKee, does that-